**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| THE ESTATE OF ULISSES M. RODRIGUEZ, *et al.*, | : : : : | |
| Plaintiffs, | : : | Civil Action No. 18-4547 (ES) |
| v. | : : | OPINION |
| CORR. OFFICER JOHNSON, *et al.*, | : : : | |
| Defendants. | : : : | |

**SALAS, DISTRICT JUDGE**

This matter is before the Court upon two separate motions to dismiss filed by defendants Gary Lanigan and George Robinson (collectively, "Supervisory Defendants") (D.E. No. 37 ("DOC Mot.")) and University Behavioral Health Care ("UBHC"), University Correctional Health Care ("UCHC"), and University of Medicine and Dentistry of New Jersey ("UMDNJ") (collectively, "Medical Defendants") (D.E. No. 43 ("Med. Mot.")).[1]  Defendants seek to dismiss the claims against them by plaintiffs Jessie Inez Rodriguez and the Estate of Ulisses M. Rodriguez (collectively, "Plaintiffs") in the second amended complaint (D.E. No. 33, Second Amended Complaint ("SAC")) pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs filed oppositions to the motions (D.E. No. 38 ("Opp. to DOC"); D.E. No. 45 ("Opp. to Med.")); and the Medical Defendants filed a reply (D.E. No. 46 ("Reply")).  Having considered the parties' submissions, the Court decides this matter without oral argument.  *See* L. Civ. R. 78.1(b).

---

[1]  The Court notes that there are other defendants in this matter who have not filed a motion to dismiss and are discussed herein only as needed.

As set forth below, the Court GRANTS-in-part and DENIES-in-part the Supervisory Defendants' Motion and GRANTS the Medical Defendants' Motion.

### I. Background[2]

Ulisses Rodriguez ("Decedent") was transferred to Northern State Prison for his protection as he was cooperating in the prosecution of other inmates. (SAC ¶ 24). Plaintiffs allege upon information and belief that Decedent was not known to have used drugs while he was incarcerated at Northern State Prison. (*Id.* ¶ 26). On November 24, 2017, at approximately 2:00 p.m., Decedent became visibly disturbed and began yelling while he was confined inside his cell. (*Id.* ¶ 27). According to the Second Amended Complaint, in response to Decedent's yelling, Defendant Johnson appeared at his cell. (*Id.* ¶ 28). "Upon information and belief, Decedent displayed signs that he was under the influence of a controlled substance such as yelling . . . and despite exhibiting signs of being disturbed, posed no threat to any corrections officer or inmate." (*Id.* ¶¶ 29–30). After assessing the situation, Defendant Johnson contacted her supervisor, Defendant Sergeant Jane Doe, who was a commanding officer in Decedent's housing unit. (*Id.* ¶¶ 31–32). Defendant Johnson asked Sergeant Jane Doe whether she should call a "code 33" which was the code designated for medical emergencies, but Sergeant Jane Doe declined and instead instructed her to call a "code 53" which was designated for emergency situations involving fighting. (*Id.* ¶¶ 33 & 34).

After Defendant Johnson called the "code 53," Defendant Corrections Officers dressed in tactical gear arrived at Decedent's cell. (*Id.* ¶ 35). At the time that Defendant Corrections Officers arrived at Decedent's cell, he was sitting on the toilet, with his pants around his ankles. (*Id.* ¶ 36). After securing Decedent's cell door, Defendant Corrections Officers "stormed Decedent's cell,

---

[2] The Court must accept Plaintiff's factual allegations as true for purposes of resolving the pending motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012).

grabbed the Decedent and slammed his body facedown onto the floor, and handcuffed his hands behind his back." (*Id.* ¶ 38). While Decedent laid face down on the floor, with his hands cuffed behind his back, Defendant Corrections Officers beat Decedent with their hands, feet, and tactical batons. (*Id.* ¶ 39). Plaintiff alleges upon information and belief that Decedent repeatedly asserted loudly that he could not breathe. (*Id.* ¶ 40). Despite Decedent's repeated pleas that he could not breathe, Defendant Corrections Officers did not take Decedent for medical attention. (*Id.* ¶ 41). Instead, Decedent was dragged from his cell and again slammed face down into the floor with his hands cuffed behind his back. (*Id.*). Defendant Corrections Officers lifted Decedent to his feet and led him down a flight of stairs to the first floor of the housing unit, where he collapsed. (*Id.* ¶ 43). Defendant Corrections Officers then lifted Decedent up from the floor and carried him to a hallway where he again was slammed face-first into the floor. (*Id.* ¶ 44). Upon information and belief, Decedent was motionless. (*Id.*). Immediately after Decedent went motionless, Defendant Corrections Officers re-entered the first floor of the housing unit, carrying the unmoving Decedent into the showers where blood was rinsed from the Decedent's face and body. (*Id.* ¶ 54). Shortly thereafter, Decedent succumbed to his injuries and died. (*Id.* ¶ 55).

The state's medical examiner conducted an autopsy on Decedent's remains and determined that Decedent died from "acute heroin poisoning." (*Id.* ¶¶ 56 & 57). The state's medical examiner reported findings of codeine, morphine and heroin in a toxicology report and also a folded piece of paper possibly containing drugs lodged in the Decedent's esophagus. (*Id.* ¶¶ 57 & 58). A second independent autopsy was performed on Decedent's body which identified injuries which are inconsistent with either self-infliction or drug use, such as a fractured sternum and other injuries to the Decedent's head, face and limbs. (*Id.* ¶¶ 60 & 61).

On March 28, 2018, Plaintiffs filed their initial complaint in this matter. (D.E. No. 1). Some defendants filed a motion to dismiss (D.E. No. 13) and, in response, Plaintiffs filed an amended complaint (D.E. No. 16). Thereafter, several corrections officer defendants, as well as Defendants Lanigan and Robinson filed a motion to dismiss. (D.E. No. 17). The Court granted-in-part and denied-in-part the motion; as relevant here, the Court granted Defendants Lanigan and Robinson's motion finding Plaintiffs had failed to sufficiently allege personal involvement. (D.E. Nos. 25 & 26). The Court allowed Plaintiffs to file a second amended complaint, which they did. (D.E. No. 33). As discussed above, both the Supervisory Defendants and Medical Defendants filed motions to dismiss in response. (D.E. Nos. 37 & 43). In their motion, the Supervisory Defendants rely on the same arguments as those raised in their prior motion, namely that Plaintiffs have again failed to allege personal involvement. (*See generally* D.E. No. 37). In their motion, the Medical Defendants argue the claims against them should be dismissed because: (i) UMDNJ, UCHC and UBHC are not suable entities; (ii) Plaintiffs fail to state a claim pursuant to 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"); (iii) as a convicted and sentenced inmate, Decedent could not have maintained a claim of deliberate indifference under the Fourteenth Amendment and, thus, neither can his estate administrator; and (iv) Plaintiff Jessie Inez Rodriguez, Decedent's daughter, does not have standing to maintain a derivative claim in her individual capacity to recover monetary damages arising out of Decedent's constitutional claims. (*See generally* D.E. No. 43).

**II.     Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

4

"A claim has facial plausibility when Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining whether there is "a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"When reviewing a motion to dismiss, '[a]ll allegations in the complaint must be accepted as true, and Plaintiff must be given the benefit of every favorable inference to be drawn therefrom.'" *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992)). But the Court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *See Iqbal*, 556 U.S. at 678. Thus the inquiry is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus*, 641 F.3d at 563. Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

### III.     Discussion

#### A.     Supervisory DOC Defendants

In their motion to dismiss, the Supervisory Defendants argue that the § 1983 claims[3]

---

[3] These Defendants also appear to be named in Claims Six and Seven for a "survivor action" and wrongful death claim under state law. (SAC ¶¶ 133–141). However, while they request dismissal of these claims (DOC Mot. at 2), Defendants do not substantively address them. Therefore, any intended request to dismiss these claims is denied.

against them should be dismissed because Plaintiffs do not allege any specific facts about their personal involvement or any facts to suggest liability as policymakers.  (DOC Mot. at 2–4).

Personal involvement by the defendant in an alleged constitutional violation is central to a § 1983 claim, and liability cannot rest on a theory of respondeat superior.  *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).  Supervisory liability generally requires some affirmative conduct by the supervisor, such as a supervisor's implementation or maintenance of a policy, practice, or custom that caused the plaintiff constitutional harm.  *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010).

There are two potential theories of supervisory liability.  *See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).  Under the first theory, defendants may be sued as policymakers "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused [the] constitutional harm.'"  *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)).  The second theory of liability provides a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.  *See Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995).

The Court of Appeals in *Barkes v. First Corr. Med., Inc.* reaffirmed its four-part standard, established in *Sample v. Diecks*, for determining whether an official may be held liable under § 1983 for implementing deficient policies.  *See Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 317 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 135 S.Ct. 2042, 2043 (2015) (citing

---

In addition, the Court's discussion of their § 1983 claims also applies to any intended claim under the New Jersey Civil Rights Act ("NJCRA").  *Camps v. Scholtz*, No. 17-1895, 2020 WL 1330326, at *3 (D.N.J. Mar. 23, 2020) (citing *Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443 (D.N.J. 2011) ("[t]he New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq.*, was modeled after and has repeatedly been interpreted analogously to § 1983")).

*Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). Under *Sample*, to find that a supervisor acted with deliberate indifference as a policymaker,

> the plaintiff must identify a supervisory policy or procedure that the supervisor defendant failed to implement, and prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory procedure.

*Barkes*, 766 F.3d at 330.

Failure to train or supervise claims "are generally considered a subcategory of policy or practice liability." *See id.* at 316. A failure to train claim requires a plaintiff to "identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur." *Palakovic v. Wetzel*, 854 F.3d 209, 233 (3d Cir. 2017) (cleaned up).

Deliberate indifference in the supervisory context may be demonstrated by "(i) showing that a supervisor failed to adequately respond to a pattern of past occurrences of injuries like the plaintiffs'; or (ii) by showing that the risk of constitutionally cognizable harm was 'so great and so obvious that the risk and the failure of supervisory officials to respond will alone' support the finding that the two-part test is met." *Beers–Capitol v. Whetzel*, 256 F.3d 120, 136–37 (3d Cir. 2001) (citing *Sample*, 885 F.2d at 1118).

Defendants Robinson and Lanigan argue that Plaintiffs have no actual factual basis to bring claims against them and instead rely on "generalized, conclusory statements that the Supervisory Defendants should have been aware of, *inter alia*, trends in opiate abuse, and that they were required to conduct unspecified training and implement unspecified policies to address said

7

trends." (DOC Mot. at 3). Defendants further argue that "these ostensible allegations have no indicia that they result from information that Plaintiffs actually hold; rather, they appear to be nothing more than unsupported conclusions drawn from the fact of the Decedent's death by overdose." (*Id.* at 3–4).

With regard to the Supervisory DOC Defendants, Plaintiffs make the following allegations:

> 68. At all relevant times, Defendant Corrections Officers were required under NJ Code 10A:31-13.15 to be trained in the use of emergency care procedures including the recognition of signs and symptoms of potential emergency situations and the recognition of symptoms of illnesses common to the facility.
>
> 69. At all relevant times hereto, Robinson and Lanigan were required to have policies in place at Northern State Prison to provide adequate training for Defendant Corrections Officers and Defendant Healthcare Providers who worked inside the facility.
>
> 70. All Defendants are and/or should be aware that the abuse of heroin and other opiate-based controlled substances had increased drastically both in correctional settings and across the country in the three years preceding the Decedent's death.
>
> 71. All Defendants are and/or should be aware that patterns of opiate abuse showed significant increases in the same demographic background of the Decedent.
>
> 73. At all relevant times hereto, Robinson and Lanigan were aware of the statutory responsibility to train Defendant Corrections Officers and Defendant Healthcare Providers who worked in Northern State Prison to recognize the signs of a heroin and/or opiate overdose and to intervene to reverse the effects.
>
> 76. In 2017, properly trained correctional healthcare providers and corrections officers were aware of the symptoms and signs of heroin and/or opiate overdoses and the effective and proper means of medical intervention to reverse the effects of a heroin and/or opiate overdose and when to employ the means of medical intervention.
>
> 100. Robinson and Lanigan and other policymakers, negligently, recklessly, and/or intentionally:

8

> a. failed to properly train and Defendant Corrections Officers and Defendant Healthcare Providers with regard to adequately assessing, monitoring and treating inmates who used and abused heroin and/or other opiates;
>
> b. failed to properly train and supervise Defendant Corrections Officers and Defendant Healthcare Providers to maintain a safe and suitable environment, and to keep inmates safe from injury, harm or death; and
>
> c. maintained policies, procedures and/or customs that were deliberately indifferent to the constitutional rights of inmates to be adequately screened for use and abuse of heroin and/or other opiates; to be adequately monitored; and to be kept safe from injury, harm or death.
>
> 125. Plaintiffs are informed, believe and therefore allege that on November 24, 2017, Defendant was aware of, should have been aware of, and/or had accrual knowledge of the pattern and culture of unconstitutional behavior and indifference, including failure to properly screen and treat inmates medical conditions, failure to adequately monitor and guard inmates, failure to have inmates properly treated medically for health problems, failure to provide safe, appropriate and needed medication, and failure to protect inmates from injury, harm or death.
>
> 126. As such, Defendant not only directed, encouraged, tolerated, acquiesced to this behavior, but was deliberately indifferent to the likelihood that his staff, employees and/or corrections officers would fail to properly screen inmates for suicidal tendencies or other problems, fail to adequately monitor inmates, fail to treat inmates medically and fail to protect inmates from injury, harm or death at the Northern State Prison.
>
> 127. The deliberate indifference of the Defendant to the need for training and supervision of his staff, employees and/or corrections officers was a proximate cause of the constitutional violations suffered by Decedent.

(SAC ¶¶ 68–71, 73, 76, 100 & 125–127).

While not the picture of clarity, it appears Plaintiffs are raising claims against these Supervisory Defendants for failing to properly train Defendant Corrections Officers and Defendant

9

Healthcare Providers to identify and treat individuals experiencing heroin overdoses and maintaining policies, procedures and/or customs that resulted in inadequate screening for drug use and keeping inmates safe from injury, harm or death.

With regard to the policy claim, Plaintiffs point to Sergeant Jane Doe's decision to call a code for fighting instead of a code for medical emergencies as factual support. (Opp. to DOC at 17) (citing SAC ¶¶ 31–35). Specifically, according to Plaintiffs, because Sergeant Doe opted to call for fighting instead of medical emergencies, the Supervisory Defendants must have maintained a deficient policy to keep inmates safe from injury, harm or death. (SAC ¶¶ 31–35 & 100(c)). However, these allegations in no way suggest that Sergeant Doe's decision was related to a policy implemented or maintained by the Supervisory Defendants. (SAC ¶¶ 31–35). Rather, the allegations merely state that Sergeant Doe made the decision to call a fighting code; without more, this does not demonstrate any policy implemented by Defendants caused Decedent's suffering and death. Moreover, the fact that Officer Johnson initially wanted to call a medical emergency code would further undercut the argument that Sergeant Doe's decision was pursuant to a prison policy. Accordingly, this claim is dismissed *without prejudice*.

The failure to train claims, however, will not be dismissed. Plaintiffs allege the Supervisory Defendants were statutorily required to train the officers to recognize and treat drug overdoses. (SAC ¶¶ 68–69 & 73). They further allege Defendants Lanigan and Robinson were aware of the prevalence of such incidents in prison settings at the time of Decedent's death. (SAC ¶¶ 70 & 71). To support a finding of deliberate indifference, in their opposition, Plaintiffs argue that "the risk of the constitutionally cognizable harm was so great and so obvious and that the risk of failure of the officials to respond supports the finding that the policies here were deliberately indifferent." (Opp. to DOC at 18). Defendants did not respond to this argument. While there is

10

not an abundance of factual support for these claims, at this early motion to dismiss stage and in the absence of a response from the Supervisory Defendants addressing Plaintiffs' argument that the risk of overdose was so great and obvious as to establish deliberate indifference, the Court finds Plaintiffs have sufficiently alleged Defendants Lanigan and Robinson were deliberately indifferent to the need to provide training for identifying and treating overdoses which led to Decedent's death. *See Polynice v. New Jersey Dep't of Corr.*, No. 19-16875, 2020 WL 2764818, at *5 (D.N.J. May 28, 2020) (denying plaintiff's motion to dismiss with similar policy allegations). Accordingly, their Motion to Dismiss this claim will be denied.[4]

### B. Medical Defendants

In their Motion, the Medical Defendants first argue Plaintiffs have failed to sue any proper entity. (Med. Mot. at 5). Specifically, "[b]y function of the New Jersey Medical and Health Sciences Education Restructuring Act, P.L. 2012, Ch. 45, UMDNJ was merged into Rutgers, the State University of New Jersey ("Rutgers") and, therefore, UMDNJ is no longer a suable entity." (*Id.*). Furthermore, UCHC and UBHC are "unincorporated constituent units of Rutgers, neither of which is a suable entity." (*Id.*) (citing https://ubhc.rutgers.edu/clinical/uchc/overview.xml). Plaintiffs argue in opposition that "[w]hether the Medical Defendants qualify as a state entity for purposes of Section 1983 turns on whether Defendants are 'persons' within the meaning of the statute." (Opp. to Med. at 15). The Medical Defendants clarify in their Reply that they did not

---

[4] The official capacity claims against the Supervisory Defendants, however, will be dismissed as Plaintiffs seek only monetary damages. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself. We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."). If Plaintiffs were seeking injunctive relief, Defendants Lanigan and Robinson in their official capacities may properly be considered "persons." *See Will*, 491 U.S. at n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'").

make any Eleventh Amendment immunity or § 1983 "personhood" arguments, but rather only that the three named entities are not properly named separate parties because they are all part of Rutgers. (Reply at 4–5).

The Court need not resolve this issue because, even assuming Plaintiffs had named the proper entity regarding medical treatment, they have failed to state a claim. The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). In order to set forth a cognizable claim for the violation of adequate medical care, an inmate must allege: (i) a serious medical need, and (ii) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Id.* at 106; *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

"A medical need is serious if it 'has been diagnosed by a physician as requiring treatment,' or if it 'is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *See Mitchell v. Beard*, 492 F. App'x 230, 236 (3d Cir. 2012) (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). "Deliberate indifference" is more than mere negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 835–36 (1994). The Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference can also be found "where the prison official persists in a particular course of treatment 'in the face of resultant pain and risk of permanent injury.'" *Id.* (quoting *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990)).

"Prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 (internal quotation marks and citation omitted). Finally, Courts give deference to prison medical authorities in the diagnosis and treatment of patients, and "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (alteration in original) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

Here, none of the facts alleged by Plaintiffs suggest deliberate indifference on the part of the Medical Defendants. While the SAC contains facts regarding the Correctional Defendants' alleged failure to take Plaintiff to receive medical attention, there are no facts indicating the medical providers were even aware of the incident or a need for medical treatment at any point. In their opposition, Plaintiffs argue that they do allege deliberate indifference on the part of the Medical Defendants, pointing to two specific portions of the SAC: "[d]espite being motionless and lying on the floor, and having previously asserted that he could not breathe, Decedent was not provided with prompt medical attention" and "[a]s a result of the attack, Decedent was denied prompt medical attention and treatment to address the effects of the heroin and/or another opiates." (SAC ¶¶ 53 & 116). However, neither of these allegations involve the Medical Defendants. Both are in the context of the Correctional Defendants' actions and *their* failure to bring him for medical treatment. (*See*, *e.g.*, ¶¶ 54 & 115–18); *Van Valen v. Lanigan*, No. 18-11441, 2019 WL 1326887, at \*12 (D.N.J. Mar. 25, 2019). Plaintiffs' reliance on their allegations regarding Decedent's pronouncement of death and autopsies is similarly unpersuasive as those facts again do not suggest

the Medical Defendants were aware of Decedent's need for medical treatment prior to his death and were deliberately indifferent to said need. (*Id.* at ¶¶ 55–61).

Nor are there any allegations in the SAC to suggest a deficient policy which would impose liability on the Medical Defendants. *See Natale*, 318 F.3d at 583 (citing *Bd. of Cty. Comm'rs of Bryan Cty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)) (plaintiff must allege that a policy or custom of that entity caused the alleged constitutional violations). Again, the portions of the Second Amended Complaint Plaintiffs rely on in their opposition do not alter this conclusion. Plaintiffs point to their allegations that "Robinson and Lanigan were policymakers and with other policymakers, developed policies, procedures and/or customs, which caused the deprivation of Decedent's constitutional rights. Said policies were inherently deficient, or in fact appropriate as formulated, but were routinely ignored and violated by Defendant Corrections Officers and Defendant Healthcare Providers with such frequency and reckless abandon that they did not fear discipline should they get caught" (SAC ¶¶ 98 & 99) to show they have stated a policy claim against the Medical Defendants. (Opp. to Med. at 23–24). The Court is unpersuaded. These allegations are contained in the portion of the Second Amended Complaint raising the failure to train claim against Defendants Robinson and Lanigan. (SAC, Second Claim for Relief ¶¶ 90–102). None of the facts relate to any policy of the Medical Defendants which could have caused Decedent's constitutional violations.

Accordingly, because Plaintiffs have failed to allege sufficient facts to show the Medical Defendants were deliberately indifferent to Decedent's serious medical needs or that they maintained a policy which caused Decedent's constitutional violations, the Court will grant their Motion to Dismiss the Eighth Amendment claims against them.[5]

---

[5] The Medical Defendants correctly argue, and Plaintiffs do not dispute, that because Decedent was a convicted and sentenced prisoner at the time of the incidents, his rights are grounded in the Eighth Amendment, not the

The Medical Defendants also move to dismiss Count Seven in the Second Amended Complaint, wherein Plaintiff Jessie Inez Rodriguez alleges that "[a]s a direct and proximate result of the conduct of the Defendants in causing the wrongful death of the Decedent, [she] has sustained pecuniary loss, economic damages and losses, mental anguish, emotional pain and suffering, pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of parental care, loss of advice, loss of counsel, loss of training, loss of guidance, loss of education and loss of filial care." (SAC ¶ 140). The Medical Defendants argue that while "a plaintiff who acts in a representative capacity may assert claims of the deceased under Section 1983 as Decedent's daughter has done in this action, there is no law that permits someone acting in their representative capacity to maintain claims in their individual capacity." (Med. Mot. at 10). In opposition, Plaintiff Rodriguez argues that Defendants improperly characterize her claim as one pursuant to New Jersey's Survivor's Act, N.J.S.A. 2A:15–3, when in fact it is brought as a Wrongful Death Act claim under N.J.S.A. 2A:31–1 to –6. (Opp. to Med. Mot. at 24–25). In their Reply, the Medical Defendants argue that Plaintiff's claim is not a wrongful death claim, but rather a "derivative deliberate indifference claim under the Eighth and Fourteenth Amendments." (Reply at 8).

---

Fourteenth. Accordingly, their Fourteenth Amendment claims against the Medical Defendants are dismissed. *See Mestre v. Wagner*, 488 F. App'x 648, 649 (3d Cir. 2012) ("Because the Fourteenth Amendment would govern his claims if he were a pretrial detainee and the Eighth Amendment would govern his claims if he were a convicted prisoner…") (internal citations omitted); *Ford v. Mercer Cty. Corr. Ctr.*, 171 F. App'x 416, 418 (3d Cir. 2006) ("[p]retrial detainees are protected by the Due Process Clause of the Fourteenth Amendment . . . . Convicted prisoners, on the other hand, are protected from cruel and unusual punishments by the Eighth Amendment.") (internal citations and quotation marks omitted).

As with the Supervisory Defendants, the Court will also dismiss the corresponding New Jersey Civil Rights Act claims for the same reasons as discussed above. *Camps*, 2020 WL 1330326, at *3 (citing *Trafton*, 799 F.Supp.2d at 443) ("[t]he New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq.*, was modeled after and has repeatedly been interpreted analogously to § 1983")).

As relied upon by the Medical Defendants, in *Endl v. New Jersey*, 5 F. Supp. 3d 689 (D.N.J. 2014), the court discussed the proper plaintiff for a wrongful death claim, as well as § 1983 claims:

> Under New Jersey law, an executor or administrator may pursue an action based on "the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he lived." N.J.S.A. 2A:15–3. More specifically, a wrongful death action for damages will be available when "the death of a person is caused by a wrongful act, neglect or default, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury." N.J.S.A. 2A:3–1. An action under this statute must be brought in the name of an administrator *ad prosequendum* of the decedent. N.J.S.A. 2A:31–2.
>
> This action was originally filed on March 21, 2012, within two years after the death of Eli Endl. Eli Endl's mother, Susan Endl, as administrator *ad prosequendum*, is entitled to bring claims based on the wrongful death of Eli Endl. There does not, however, appear to be any basis for Anthony Endl's standing as plaintiff under New Jersey state law. Under the New Jersey Survivorship and Wrongful Death statutes, the class of persons entitled to sue is restricted to the administrator *ad prosequendum* or executor. N.J.S.A. 2A:31–2; 2A:15–3. Section 1983 incorporates these state law limitations on representative capacity. All of the claims in this action are asserted on behalf of the deceased, Eli Endl. I will therefore dismiss Anthony Endl (who sues as an individual) and Susan Endl (in her individual capacity) as plaintiffs. This action will go forward with Susan Endl, administrator *ad prosequendum*, as plaintiff.

*Id.* at 696. The exact nature of the claim raised in Plaintiff's seventh count is unclear. Whether it is intended as a § 1983 claim or wrongful death claim under New Jersey law, however, Plaintiff in her individual capacity is not a proper plaintiff. *See id.* The proper plaintiff would instead be Plaintiff in her role as administrator *ad prosequendum* of the estate. *Id.*; N.J. Stat. Ann. § 2A:31-2 ("[e]very action commenced under this chapter shall be brought in the name of an administrator *ad prosequendum* of the decedent for whose death damages are sought…"); *LaFage v. Jani*, 766 A.2d 1066, 1074 (2001) ("New Jersey's Wrongful Death Act authorizes the administrator *ad*

*prosequendum* or the executor or administrator with the will annexed to bring the action. Although the wrongful death action can be instituted only by an administrator *ad prosequendum* or the executor or administrator with the will attached . . . "). Accordingly, any intended claim raised by Plaintiff in her individual capacity is dismissed. *Endl*, 5 F. Supp. 3d at 696.

## IV. CONCLUSION

Based on the foregoing, the Supervisory Defendants' Motion is GRANTED as it relates to the policy claim and DENIED as it relates to the failure to train claim. The corresponding NJCRA policy claim is also DISMISSED. The Section 1983 and NJCRA claims against the Supervisory Defendants in their official capacity are DISMISSED *with prejudice*. The Medical Defendants' Motion is GRANTED. An appropriate order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**